HIGGINS *v.* PENINSULAR PORTLAND CEMENT CO.

1. APPEAL AND ERROR—REVIEW—REFUSAL TO DIRECT VERDICT—
   PROPRIETY.
   The rule that in determining whether a verdict should have
   been directed for defendant the testimony will be given a
   construction and effect most favorable to plaintiff should not
   be applied to supply facts which the plaintiff either cannot
   or will not disclose.

2. MASTER AND SERVANT—INJURIES TO SERVANT—EVIDENCE—SUF-
   FICIENCY.
   In an action against the owner of a cement mill for injuries to
   a servant caused by his being caught in the gearing of cer-
   tain machinery while filling an oil cup, evidence examined,
   and *held,* sufficient to go to the jury on the questions of the
   sufficiency of the instructions and warning given to plaintiff,
   the obvious or non-obvious character of the peril, and the
   care or want of care exercised by plaintiff.

Error to Jackson; Parkinson, J. Submitted January
21, 1908. (Docket No. 106.) Decided May 1, 1908.

Case by Patrick Higgins against the Peninsular Port-
land Cement Company for personal injuries. There was
judgment for plaintiff, and defendant brings error.
Affirmed.

*Brennan, Donnelly & Van De Mark,* for appellant.

*Richard Price,* for appellee.

OSTRANDER, J. The defendant in asking a reversal of
the judgment makes a single assignment of error, which
is that the court should have directed a verdict in its fa-
vor. The duty of the defendant alleged in the declara-
tion is to provide a safe place for its employés, to properly
safeguard all gearings and dangerous machinery, to keep
its room properly lighted, to instruct its employés in the

work they were required to perform, and warn them of attendant dangers. As breaches of duty, it is averred that defendant negligently failed to place any guard around the gearing in which the plaintiff was injured, or to properly safeguard it, failed to properly light the room in which plaintiff was employed, failed to instruct and to warn the plaintiff with respect to dangers attendant upon the particular employment. No breach of statutory duty is alleged. It is said in the brief of counsel for plaintiff that he did not assume the risk because the statute made it the duty of defendant to guard this gearing and that his client could not assume a risk due to an omission to perform a statutory duty, and reference is made to the case of *Swick* v. *Cement Co.*, 147 Mich. 454. In the brief for appellant, the subject is dismissed with this statement:

"If defendant were guilty of negligence of any failure to guard the machinery, it would be by reason of some statute; but plaintiff does not rely upon any statute in his declaration, but merely charges defendant with negligence in not safeguarding this machinery."

At the trial, defendant offered testimony tending to prove that the factory had been inspected by the State factory inspector at different times, who had examined this particular machinery. He was asked to state whether any guard had been ordered put on the cogs of this particular machine. To this, counsel for the plaintiff objected, saying:

"We are not claiming anything because of any order from an inspector, and they have no right to show that he has or has not ordered it, because the inspector cannot shield them in any way so long as we claim nothing for it."

The court excluded the testimony, and instructed the jury as follows:

"In this case no such question can arise for your consideration as to whether this machinery in question at the place where the plaintiff claims to have been injured might have been safer or safeguarded, because the testimony is

undisputed that similar machinery and in a similar condition is in common use in cement factories, and you should not find the defendant company guilty of negligence because it had and used this particular machinery in the way it did. I instruct you that you must assume that this machinery was suitable and proper, and that defendant had a right to have it in its factory in the way it was there and to use it."

We must assume that the jury found the negligence of defendant to be something other than the failure to guard the gears. Whether there was any breach of duty to light the place, or to instruct or warn the plaintiff, and whether plaintiff's conduct was reasonably careful conduct, in view of all the circumstances, are questions which remain and may be considered together. The plaintiff was injured a little after noon on April 1, 1905, in an attempt to remove or to replace the cover upon an oil cup which he had filled or was about to fill with oil, his thumb and the first finger of his hand being caught in a gearing which was in close proximity to the oil cup. He was more than 23 years old and altogether had been employed by the defendant from two and one-half to three years at different work about its factory. At the time of his injury, he was fireman and it was a part of his duty to oil certain portions of the machinery and to oil the machinery at the particular place where he was engaged when the injury was received. Plaintiff's testimony leaves the question of the time he had been employed as fireman altogether uncertain and also the number of times he had oiled the machinery. As an example, the following is quoted from his testimony:

" *Q.* You did the oiling for 10 or 12 days?

" *A.* Yes, sir, that is what I think it is. I wouldn't swear to it. I knew it was my duty to do the oiling, and I was doing my duty. I was oiling the bearings there; that is, oiling the boxes, the oil boxes.

" *Q.* You were filling the boxes with oil for a period of twelve days?

" *A.* Yes, sir."

Further along he testified:

" *Q.* It was your duty to oil those cups at least twice a day?

"*A.* No, sir.   Didn't get no orders to that effect.

" *Q.* It was your duty to fill them once a day, wasn't it?

"*A.* Fill them once a week.   *   *   *

" *Q.* Do you mean to tell this jury you received orders to only fill those cups once a week?

"*A.* I think that was the orders I got.   *   *   *

" *Q.* Do you mean to say you worked there 10 or 12 days and never filled those cups with oil?   *   *   *

"*A.* To my memory I don't think I ever filled them before.   I might have and I might not.

" *Q.* Well, don't you remember?

"*A.* No, sir.   *   *   *

" *Q.* You mean to tell us this day is the first day you put any oil in those cups, you had never been upon that ladder before?

"*A.* I didn't swear I didn't.   I might have oiled it before.

" *Q.* You might have oiled it twice before?

"*A.* I don't think I ever did.

" *Q.* Didn't you know it was your duty—for those cups to be oiled twice a day?

"*A.* No, sir; I never oiled them twice a day."

There is testimony tending to prove that he was shown how and where to oil about three days before he was injured.   The room in which he worked, called the coal or dryer room, was 30 by 60 feet in size.   In the room besides the drag or elevator at which he had formerly worked were two cylinder dryers 40 feet long and four feet in diameter.   They are elevated above the floor of the room.   The upper and higher end of each dryer rests upon a cement pier about six feet five inches high.   These cylinders revolve over a fire and are driven by a gearing constructed on the head of the pier.   There is a large cogwheel fastened around the upper end of the cylinder which meshes with a small cogwheel underneath the cylinder about twelve and a half or thirteen inches in diameter.   The dryer, and of course the larger cogwheel, makes two

and one-half revolutions a minute, the smaller wheel about fifteen revolutions a minute. The two dryers are six or seven feet apart. On each side of the smaller cogwheel which has been referred to are oil boxes to lubricate the bearings. As the record is understood, they are rectangular in form, each having a cover which has to be removed when the oil is put into the box and replaced when it is filled. The covers are four inches long, two and one-half inches wide, and each weighs eight or ten ounces and has a flange of one-eighth of an inch. The tops of the oil boxes are substantially on a level with the point where the two gears mesh together, are some ten inches above the face of the pier, and at the nearest point are about an inch from the gear. There are other oil cups on the pier head to be filled, and there is other gearing and machinery also upon the pier heads. In oiling, a ladder is used, upon which the oiler mounts and, using an oil can, fills the boxes. For certain of the boxes, the ladder is placed against the north face of the pier and the oiler in mounting it faces directly south. To oil the box in question and to avoid reaching over other gearing, the ladder is placed on the side of the pier and mounted there, and it is the testimony of the plaintiff that he had so placed his ladder on the east side of the west pier; that he had oiled the cup on the north side of the cogwheel and was either removing or replacing the cover of the box on the south side of the cogwheel, using his right hand and holding his oil can in his left hand, when his thumb and forefinger became engaged in the cogs. The larger wheel, the face of which is narrower than the face of the smaller wheel by about an inch, had a slight lateral motion as it revolved, so that at times it came nearer the oil box than at other times. Drawings and photographs showing the arrangement of the machinery were made use of in the court below and have been furnished to this court. It is not convenient, is indeed practically impossible, to reproduce them. The face of the large cogwheel is five inches wide, and of the smaller and lower wheel six inches

wide, and, if the plaintiff was oiling from the east side of the pier, they would be directly in front of him and some 40 or 45 inches from the edge of the pier. The action required in oiling the bearing is very simple. It is evident that under ordinary conditions to see another perform the operation or to actually perform it would be to know how to do it. The danger to be avoided was the cogs. But there is testimony supporting the theory of the plaintiff that the position of the oil cups was made uncertain to the vision by the surrounding machinery, that the room was dark, the air filled with dust, which obscured objects, lessened the effect of the artificial lighting, and made a view of the machinery at the particular point difficult; that an artificial light should have been placed nearer to the place in question; that while plaintiff had, under these conditions, observed others oil the machinery, had been shown where the cups were, and how to perform the operation, and had, probably, filled the particular cup one or more times before he was hurt, he did not know, had not been told and could not distinctly see the proximity and relation of the oil box in question to the intermeshing cogs. We are not impressed with the story told by plaintiff. There is very satisfying testimony tending to prove him to have understood the situation and to have carelessly brought about his injury.

In applying the rule that in determining whether a verdict should have been directed for defendant, the testimony will be given a construction and effect most favorable to plaintiff, we have not treated it as a rule which in application supplies facts which the plaintiff either cannot or will not disclose. The record presents a remarkable case of the refusal or the inability of a plaintiff to answer material questions and of repeated instances of what appear to be more or less clever efforts to return evasive rather than responsive answers. We are nevertheless constrained to say that reasonable minds might differ concerning the sufficiency of the instruction and warning (if there was any oral warning) given to plain-

tiff, and concerning the obvious or non-obvious character of the peril, the entire situation being considered. And so, also, of the care or want of care exercised by the plaintiff. The case was one for a jury, and the judgment is affirmed.

GRANT, C. J., and MONTGOMERY, HOOKER, and CARPENTER, JJ., concurred.